T.C. Memo. 2001-318

UNITED STATES TAX COURT

TONY D. ISHIZAKI, Petitioner, AND
RANG SUN PARK ISHIZAKI, Intervenor <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11358-99.          Filed December 27, 2001.

        P and I filed a joint 1995 Federal income tax
return.  Following examination, R determined that
constructive dividend income from a furniture business
operated by the spouses had been omitted on the 1995
return.  After a joint notice of deficiency was issued
to P and I, P filed a petition with this Court not
challenging R's determinations but seeking relief from
joint and several liability.  I subsequently intervened
in the proceeding, disputing P's entitlement to the
relief sought.

        <u>Held</u>:  P has failed to establish his entitlement
to relief from joint and several liability pursuant to
either subsec. (b) or subsec. (c) of sec. 6015, I.R.C.

<u>Joseph E. Diamond</u>, for petitioner.

<u>Mufthiha Sabaratnam</u>, for intervenor.

<u>David R. Jojola</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NIMS, Judge:  Respondent determined a Federal income tax deficiency for petitioners' 1995 taxable year in the amount of $64,745.  Respondent also determined an addition to tax of $16,295 pursuant to section 6651(a)(1) and an accuracy-related penalty of $12,949 under section 6662(a).  After concessions, the sole issue for decision is the claim by Tony D. Ishizaki (petitioner) for relief from joint and several liability for the deficiency, addition, and penalty determined by respondent.

Unless otherwise indicated, all section references are to sections of the Internal Revenue Code of 1986, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

At the time of filing his petition in this case, petitioner provided an address in Montebello, California.  Petitioner's educational background consists of a high school education that continued partially through the tenth grade and approximately 3 months of junior college courses.  Thereafter and throughout all relevant periods, petitioner has been involved in business ventures relating to the manufacture and sale of furniture.  Prior to his marriage, petitioner created a company called Tony Ishizaki Studios which operated in this sector.  Then, in 1986

petitioner and intervenor Rang Sun Park Ishizaki (Mrs. Ishizaki) were married. Following their marriage, Mrs. Ishizaki joined petitioner in operating his company, which in about 1989 or 1990 began doing business under the name of Stone Collection. Stone Collection, in turn, was succeeded in 1994 by Privilege House, Inc. Both petitioner and Mrs. Ishizaki were employed by Privilege House during 1995, the year at issue.

The respective roles played by petitioner and Mrs. Ishizaki in the operation of Stone Collection and Privilege House can be broadly described as follows. Petitioner was primarily responsible for sales management and for research and development. Mrs. Ishizaki's principal responsibilities focused on financial matters, production scheduling, and office management.

Revenues at Privilege House were generated though the sale to customers of home furnishing items manufactured by the company. Petitioner, in his research and development capacity, worked to design styles that would appeal to customers. For those items selected to be offered to customers, Mrs. Ishizaki created a price list enumerating the intended selling prices. Petitioner then worked with commissioned salespersons to finalize sales to customers. The salespersons would introduce petitioner to potential buyers as representing Privilege House, and petitioner would negotiate the final sales price. Petitioner had

authority to offer reasonable discounts, such as 5 or 10 percent, in order to close sales but would seek the consent of Mrs. Ishizaki if a buyer requested a more excessive allowance. When an order was placed, either petitioner or a salesperson would write up a sales order reflecting the final price, and the order would go to Mrs. Ishizaki for processing and placement on the production schedule.

Subsequent payment from customers for purchased pieces was often remitted in the form of checks payable to Privilege House. During 1995, certain checks received by Privilege House from customers were cashed at banks and check-cashing facilities, rather than deposited into the corporation's bank account. The total amount of checks so cashed was approximately $191,800. The funds obtained thereby were then used in significant part for personal expenses of the Ishizakis. The proceeds of the cashed checks were reported on neither Privilege House's 1995 corporate income tax return nor the Ishizakis' personal income tax return.

At pertinent times and through at least 1996, petitioner and Mrs. Ishizaki maintained what must be characterized as a relatively high standard of living. The couple and their child resided in a four- to five-bedroom ranch-style home with a swimming pool in Monterey Park. They leased the property at a rate of approximately $1,700 to $1,800 a month and also employed an individual for about $600 a month to maintain their residence

and take care of their daughter. They purchased $15,000 worth of furniture for their home in 1996. They kept at any given time an average of two to three vehicles, typically leased, which included a BMW 740, a Toyota Four Runner, a Porsche, and a Honda NSX. They also owned a jet ski. The family generally ate out several times per week and took vacations, particularly ski vacations, two to three times per year. Both spouses bought expensive clothing and owned watches and jewelry which were kept in bank safe deposit boxes. Petitioner primarily used a credit card for his purchases and then gave the receipts to Mrs. Ishizaki. Bill payment and family finances were then handled by Mrs. Ishizaki. The couple also maintained a joint checking account.

On February 6, 1997, respondent commenced an examination of Privilege House. The taxable year under consideration was 1995, and the examination was begun on the basis of two checks obtained by the Internal Revenue Service from a check-cashing business. Revenue Agent Mayra Encarnacion performed the examination and in connection therewith conducted an interview on June 2, 1997, with Mrs. Ishizaki and Jane Kim, the accountant for Privilege House and for the Ishizakis personally. Ms. Encarnacion asked at the interview whether all corporate checks were deposited to the Privilege House account and was initially told that they were. Subsequently, however, when Ms. Encarnacion raised the

possibility of issuing summonses to customers to obtain copies of checks written to Privilege House, Mrs. Ishizaki provided a list of cashed checks. Ms. Encarnacion also met at some point during the examination with petitioner.

During 1997, Mrs. Ishizaki filed for separation from petitioner. The divorce settlement was not yet finalized at the time of trial of this case in March of 2001. In the intervening period, the record indicates that control of the Privilege House business shifted between the spouses. At the time of trial, petitioner was no longer involved and had begun another furniture company of his own, operating under the name of Anderson & Daish.

On March 25, 1999, respondent issued a notice of deficiency to petitioner and Mrs. Ishizaki. Therein respondent determined that petitioners had $191,831 in unreported income for 1995, in the form of constructive dividends from Privilege House. Although Mrs. Ishizaki did not petition the Court for redetermination, petitioner filed his petition in this case on June 22, 1999. The petition expresses the alleged errors in the notice of deficiency as follows:

> 4. The determination of the tax set forth in the said
>    notice of deficiency is based upon the following
>   errors.
>       a. The taxpayer is an innocent spouse and did not
>          in any way benefit from the unreported income.
>       b. The petitioner does not believe that he signed
>          the tax return for that year.
>
> 5. The facts upon which the petitioner relies, as the

basis of the petitioner's case, are as follows:
   a. Petitioner's wife ran the business in question and the petitioner did not receive any benefit from any funds that were taken from the business.
   b. The petitioner has no memory of signing the tax return.

Petitioner did not and does not dispute the deficiency, addition to tax, or penalty as set forth in the notice of deficiency. (Nor, for that matter, does Mrs. Ishizaki.) Respondent then answered, denying and placing in dispute petitioner's contentions.

After answering the petition, respondent referred the case to its Examination Division for the purpose of investigating the merits of petitioner's entitlement to relief pursuant to section 6015. Revenue Agent David Guerrero conducted this examination. He initially spoke with Ms. Encarnacion to gain background information and then interviewed petitioner. In addition, during the period that petitioner's claim was under consideration, respondent by letter provided Mrs. Ishizaki with an opportunity to submit information regarding petitioner's entitlement to relief, but Mrs. Ishizaki failed to respond. Mr. Guerrero began his evaluation with the requirements of section 6015(b) and, upon concluding that petitioner was entitled to full relief under that subsection, did not consider petitioner's entitlement to relief under section 6015(c) or 6015(f). Underlying Mr. Guerrero's conclusion was a judgment that the return was a joint return

because, although not signed by petitioner, it was signed with his consent. Mr. Guerrero then determined that petitioner had no knowledge or reason to know of the understatement on the basis of his limited education and alleged lack of involvement in the financial affairs of the corporation.

Thereafter, this Court decided King v. Commissioner, 115 T.C. 118 (2000). In accordance with the holding in that case, respondent on November 1, 2000, mailed a notice to Mrs. Ishizaki informing her of her right to intervene in the instant proceeding. Mrs. Ishizaki filed a notice of intervention with the Court on December 19, 2000, wherein she disputed petitioner's entitlement to relief under section 6015.

Trial was held on March 28, 2001, and both petitioner and Mrs. Ishizaki appeared, were represented by counsel, and offered testimony. Following trial, all three parties submitted opening posttrial briefs; respondent alone filed a reply brief. The body of petitioner's brief cites and discusses only repealed section 6013(e)(1), but a sheet attached to the brief and labeled "POINTS AND AUTHORITIES IN SUPPORT OF PETITIONER'S CONTENTION HE IS AN INNOCENT SPOUSE" cites section 6015(b) and enumerates its requirements. No mention is made of other provisions of section 6015. Mrs. Ishizaki and respondent both take the position on brief that petitioner is not entitled to relief from joint and several liability.

OPINION

## I.  General Rules

As a general rule, section 6013(d)(3) provides that "if a joint return is made, the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several."  An exception to such joint and several liability exists, however, for spouses able to satisfy the statutory requirements for relief.

### A.  Prior Law

Prior to the enactment of the Internal Revenue Service Restructuring & Reform Act of 1998 (RRA), Pub. L. 105-206, sec. 3201, 112 Stat. 734, section 6013(e) governed the granting or denial of claims for relief from joint liability.  Section 6013(e) read in part as follows:

> SEC. 6013(e).  Spouse Relieved of Liability in Certain Cases.--
>
> > (1) In General.--Under regulations prescribed by the Secretary, if--
> >
> > > (A) a joint return has been made under this section for a taxable year,
> > >
> > > (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse,
> > >
> > > (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and
> > >
> > > (D) taking into account all the facts

and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,

then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.

The section then went on to impose an additional requirement, in order for relief to be available, that the understatement exceed a specified percentage of the income of the spouse who was seeking such relief. See sec. 6013(e)(4).

B. <u>Present Law</u>

The RRA revised and expanded the relief available to joint filers by striking subsection (e) from section 6013 and by promulgating in its place a new section 6015. RRA sec. 3201(a), (e)(1), 112 Stat. 734, 740. Section 6015 was also given retroactive effect to the extent that it was made applicable to any liability for tax arising after July 22, 1998, and to any liability for tax arising on or before such date but remaining unpaid as of July 22, 1998. RRA sec. 3201(g)(1), 112 Stat. 740.

Whereas section 6013(e) had offered only a single avenue of relief, based on a spouse's lack of knowledge or reason to know of a substantial understatement, section 6015 authorizes three types of relief. Subsection (b) provides a form of relief available to all joint filers and similar to, but less restrictive than, that previously afforded by section 6013(e).

Subsection (c) permits a taxpayer who has divorced or separated to elect to have his or her tax liability calculated as if separate returns had been filed.  Subsection (f) confers discretion upon respondent to grant equitable relief, based on all facts and circumstances, in cases where relief is unavailable under subsection (b) or (c).  As relevant to the present matter, section 6015 provides the following:

SEC. 6015.  RELIEF FROM JOINT AND SEVERAL LIABILITY ON JOINT RETURN.

(a) In General.--Notwithstanding section 6013(d)(3)--

(1) an individual who has made a joint return may elect to seek relief under the procedures prescribed under subsection (b); and

(2) if such individual is eligible to elect the application of subsection (c), such individual may, in addition to any election under paragraph (1), elect to limit such individual's liability for any deficiency with respect to such joint return in the manner prescribed under subsection (c).

Any determination under this section shall be made without regard to community property laws.

(b) Procedures for Relief From Liability Applicable to All Joint Filers.--

(1) In general.--Under procedures prescribed by the Secretary, if--

(A) a joint return has been made for a taxable year;

(B) on such return there is an understatement of tax attributable to erroneous items of one individual filing the joint return;

(C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;

(D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and

(E) the other individual elects (in such form as the Secretary may prescribe) the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the individual making the election,

then the other individual shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such understatement.

(2) Apportionment of relief.--If an individual who, but for paragraph (1)(C), would be relieved of liability under paragraph (1), establishes that in signing the return such individual did not know, and had no reason to know, the extent of such understatement, then such individual shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to the portion of such understatement of which such individual did not know and had no reason to know.

          *     *     *     *     *     *     *

(c) Procedures To Limit Liability for Taxpayers No Longer Married or Taxpayers Legally Separated or Not Living Together.--

(1) In general.--Except as provided in this subsection, if an individual who has made a joint return for any taxable year elects the application

of this subsection, the individual's liability for any deficiency which is assessed with respect to the return shall not exceed the portion of such deficiency properly allocable to the individual under subsection (d).

(2) Burden of proof.--Except as provided in subparagraph (A)(ii) or (C) of paragraph (3), each individual who elects the application of this subsection shall have the burden of proof with respect to establishing the portion of any deficiency allocable to such individual.

(3) Election.--

(A) Individuals eligible to make election.--

(i) In general.--An individual shall only be eligible to elect the application of this subsection if--

(I) at the time such election is filed, such individual is no longer married to, or is legally separated from, the individual with whom such individual filed the joint return to which the election relates; or

(II) such individual was not a member of the same household as the individual with whom such joint return was filed at any time during the 12-month period ending on the date such election is filed.

*    *    *    *    *    *    *

(C) Election not valid with respect to certain deficiencies.--If the Secretary demonstrates that an individual making an election under this subsection had actual knowledge, at the time such individual signed the return, of any item giving rise to a deficiency (or portion thereof) which is not allocable to such individual under subsection (d), such election shall not apply to such

> deficiency (or portion). This subparagraph
> shall not apply where the individual with
> actual knowledge establishes that such
> individual signed the return under duress.

## II. Preliminary Matters

### A. Burden of Proof

We begin with a threshold observation regarding burden of proof. In general, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving otherwise. Rule 142(a). Although recently enacted section 7491 may operate in specified circumstances to place the burden on the Commissioner, the statute is effective only for court proceedings that arise in connection with examinations commencing after July 22, 1998. RRA sec. 3001(c), 112 Stat. 727. With respect to the case at bar, the parties have stipulated that the examination of Privilege House which led to the constructive dividends pertinent here began on February 6, 1997, the record is bereft of any other evidence that would require applicability of section 7491, and petitioner has at no time so argued. We therefore are satisfied that petitioner bears the burden of establishing his entitlement to relief from joint and several liability under the general rules.

Furthermore, we pause to observe that section 7491(a)(3) provides that the burden-shifting provisions referenced above do not apply "to any issue if any other provision of this title provides for a specific burden of proof with respect to such

issue."  Section 6015(b)(1)(C) expressly requires the spouse electing relief to establish that he or she did not know or have reason to know of the understatement, and section 6015(c)(2) explicitly places the burden of proof on the electing spouse to establish the portion of any deficiency allocable to him or her. However, because such provisions do not appear to specifically account for all requisite elements set forth in section 6015, we in exercise of caution do not rely solely thereon.

We also point out at this juncture that in deciding whether petitioner has carried his burden of proof, witness credibility is an important consideration.  Moreover, we are under no obligation to accept uncorroborated and self-serving testimony. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  In this connection, we note that, having evaluated demeanor and content, we found the credibility of both petitioner and Mrs. Ishizaki to be questionable at best.  Their testimony tended to be nonspecific, inconsistent, and patently self-serving, such that the trial at times had a decided "he said, she said" flavor. Accordingly, our analysis below is based primarily on, and limited by, what could be reliably drawn from the totality of the evidence and testimony, rather than by accepting in their entirety the statements of either spouse at face value.

B.  Joint Return

As a second preliminary matter, we deal briefly with the issue of whether petitioner and Mrs. Ishizaki filed a joint return for 1995 within the meaning of section 6015.  While statements in the petition can be read to argue that the return at issue was not a proper joint return of petitioner and Mrs. Ishizaki, and testimony indicates that Mrs. Ishizaki signed petitioner's name to the document, we conclude that petitioner has conceded any contention in this regard.  The statement of "POINTS AND AUTHORITIES" attached to petitioner's brief includes the following:  "In this case the IRS has taken the position that a joint return has been filed and the petitioner accedes to that position due to his allowing his former spouse to have control over all of his finances and taxes during the term of the marriage."  Petitioner also states in the body of his brief: "The parties stipulated that they filed a joint tax return for 1995 satisfying Sec. 6013(e)(1)(A)."  Thus, although former section 6013(e) is not at issue, and petitioner's characterization is more explicit than the language used in the parties' stipulations, it is clear that no question of filing status is being advanced.  We therefore turn to whether petitioner is eligible for relief from the joint and several liability otherwise following from the joint return filed.

III.  Section 6015(b)

As previously mentioned, the two statutory bases for relief specifically referenced in petitioner's submissions are former section 6013(e) and section 6015(b).  Since section 6013(e) has been repealed and is no longer available to petitioner, and since section 6015(b) is considered to have replaced the analogous section 6013(e), we view the statements made by petitioner in connection with either of the two statutes in light of the current requirements of section 6015(b).  In addition, we note that cases interpreting former section 6013(e) remain instructive in our analysis of the parallel requisites of section 6015(b).  Butler v. Commissioner, 114 T.C. 276, 283 (2000).

Having previously concluded that a joint return satisfying section 6015(b)(1)(A) was filed for 1995, we focus first on the second requirement set forth in section 6015(b).  Section 6015(b)(1)(B) mandates that the understatement of tax be attributable to erroneous items of the nonrequesting spouse.  A similar attribution provision was contained in former section 6013(e)(1)(B) and has been construed by this and other courts. As regards the pertinent legal standard, the Court of Appeals for the Fifth Circuit has stated:  "where omitted income is generated by the performance of substantial services by one spouse, that income should be attributed to that spouse for purposes of

section 6013(e)(1)." Allen v. Commissioner, 514 F.2d 908, 913 (5th Cir. 1975), affg. in part and revg. in part on other grounds and remanding 61 T.C. 125 (1973).

This Court then applied the foregoing principle in Grubich v. Commissioner, T.C. Memo. 1993-194, to a situation bearing marked resemblance to that now before us and also involving the omission of income generated by a business. In Grubich v. Commissioner, supra, Mr. and Mrs. Grubich operated The Original Christmas Store, which sold holiday decorations and gift items. Mr. Grubich handled the financial and administrative side of the business. Id. Mrs. Grubich handled the artistic and decorative side, creating merchandise displays and selecting inventory. Id. We characterized the situation as follows:

> Although petitioner may not have understood how Mr. Grubich handled the financial and tax affairs of The Original Christmas Store, and even though it was Mr. Grubich who fraudulently omitted the items of gross income from the gross receipts reported on the Schedule C of their returns, there is overwhelming evidence that the gross income itself (rather than its omission) was attributable to the joint efforts and activities of Mr. and Mrs. Grubich. * * *

> Petitioner, along with her former husband, actively and substantially participated in the business activity that generated the omitted income. Therefore, the substantial understatements were attributable to grossly erroneous items of both Mr. Grubich and petitioner. [Id.]

Furthermore, because there was "nothing in the record that would enable us to make an allocation of the relative value of petitioners' respective services", we concluded: "Inasmuch as

petitioner has not shown what part of the omitted income was attributable to Mr. Grubich, she has failed to satisfy the requirements of section 6013(e)(1)(B)."  Id.

As was the case in Grubich v. Commissioner, supra, petitioner here actively and substantially participated in the Privilege House business which generated the unreported income. In fact, it was petitioner, not Mrs. Ishizaki, who was involved in making and closing the sales which actually produced revenue for Privilege House.  Petitioner even testified at one point "I worked 24 hours a day, seven days a week, because she said, 'We're going to go broke if you don't sell more furniture.'" While we do not opine regarding the truth of this statement in its entirety, it at least stands for the proposition that petitioner played, and does not dispute that he so played, an important role in generating Privilege House sales.  Furthermore, because there is nothing in the record that would enable us to allocate sales between the spouses based on the relative value of their services to the enterprise, we cannot determine the respective amounts of income attributable to each.  Accordingly, since petitioner has failed to establish that any portion of the understatement is attributable solely to erroneous items of Mrs. Ishizaki, he has failed to prove that he satisfies the criteria for relief under section 6015(b).

Moreover, although the foregoing failure to meet the attribution prong of section 6015(b)(1)(B) is a sufficient basis on which to deny relief under that subsection, we point out for the sake of completeness that other requisites of section 6015(b) are equally unfulfilled on the facts before us.  In particular, section 6015(b)(1)(C) mandates that the requesting spouse have had neither knowledge nor reason to know of the understatement at the time the return was signed.  A requesting spouse is considered to have reason to know in this context if a reasonably prudent taxpayer in his or her position, at the time the return was signed, could be expected to know that the return contained an understatement or that further investigation was warranted. Butler v. Commissioner, supra at 283.  Hence, the spouse seeking relief has a "duty of inquiry".  Id. at 284.  In applying the foregoing "reason to know" standard, factors considered relevant include:

> (1) The alleged innocent spouse's level of education;
> (2) the spouse's involvement in the family's business
> and financial affairs; (3) the presence of expenditures
> that appear lavish or unusual when compared to the
> family's past income levels, income standards, and
> spending patterns; and (4) the culpable spouse's
> evasiveness and deceit concerning the couple's
> finances. [Id.]

Here, the return at issue was signed on August 12, 1996, and reported total income of $108,547.  As of that date, the evidence regarding petitioner's knowledge in general and the majority of the above factors in particular is in many respects inconsistent

and lacking in credibility.  It can be drawn from the record that petitioner's educational background and involvement in family financial affairs were relatively limited.  However, the couple's accountant did testify that it was her practice to speak to both spouses in preparing the annual return, so petitioner likely had some familiarity with family finances.  In addition, petitioner's involvement in the family business, as well as similar furniture ventures, was extensive.  It is also apparent that the family maintained a standard of living sufficiently high to at least call into question its sustainability for three persons on the level of income reported.  There is also little to suggest that Mrs. Ishizaki was intentionally evasive or deceitful with respect to the couple's finances.  Rather, it seems more probable that petitioner simply chose in many instances to turn a blind eye to the source of the funds paying the bills for a lifestyle in which he willingly participated.

Furthermore, the testimony in this case which probes the status of petitioner's knowledge hardly buttresses petitioner's protestations of innocence.  For example, during direct examination, petitioner first testified as follows:

> Q    Okay.  During 1995, there's evidence that there were checks from customers of Privilege House that were cashed and not deposited to Privilege House.  When did you find out about that?

> A    When Mayra visited me.

Q    Did you have any idea whether or not there was any unreported income in either the company called Privilege House or your personal tax return, up until that date?

A    No.  I was not aware of it until after she filed for the divorce, when I started finding discoveries.

Q    Did you know that checks were being cashed occasionally from Privilege House?

A    After 1997 when she filed and I took over the business on August 15th of '97, that's when I started finding out.

Then, later during the direct examination, petitioner gave

the following testimony:

Q    Did you ever find out that there was a great deal of cash available in the--either under the control of you or Rang Ishizaki?

A    At which part of time.

Q    Any time?

A    Any time, yes.

Q    When was that?

A    She discussed to me about cash thing on the money, 1996.

Q    She told you about the cash in 1996?

A    Correct.  She said, "I want you to go to the bank."

Q    Okay.  Who told you, "I want you to go to the bank."?

A    Jane Kim and Rang.

Q    And what were you supposed to do at the bank?

A     Oh, they give me a check and they told me to go to the bank and cash the check, so she can pay the vendors.

Q     Okay.  So you--

A     To get a discount.

Q     So you went and cashed a check.

A     Correct, sir.

Q     And what did you do with the cash?

A     I gave it to her.

Q     And how much was that check?

A     Sometimes 2,000, sometimes 4,000.

Q     How many times did you do this?

A     Less than ten times.

Q     Okay.  Were these checks written from Privilege House?

A     No, sir.  Those checks were a customer's check.

Q     Okay.  And what--and when you went and cashed those checks, what did you do with the cash?

A     The check, Jane Kim told me to go to a Center Bank Manager and see him.  And I went to see this man and I give him the check, he signs it, then I go to the teller and get the cash, and I give it to her.

Then on cross-examination and in response to an inquiry

regarding petitioner's visits to the family's safe deposit boxes,

he testified:

Q     Okay.  Was there ever any money in the safety deposit box?

A     At the time '96, yes.

Q     How do you know that?

A    '96 I saw the money there.

Q    You saw the money there.  How much was there?

A    At the highest I ever saw it was $180,000.00.

Q    Okay.  And how did you verify that there was $180,000 there?

A    She told me that's our savings.

Finally, toward the latter part of cross-examination, petitioner added the following testimony regarding the cash transactions:

Q    Oh, okay.  At any time did you go to a check cashing place and cash checks?

A    Yes, at the bank, at the Sahaen Bank.

Q    The Sahaen Bank?

A    Yes.

Q    This is Sahaen Bank, but not a check cashing place, you didn't go to a private check cashing place?

A    Check cashing place.  One time, one or two times.

Q    And this was you voluntarily went?

A    No.  She told me to go there.

Q    Okay.  And the--can you remember the amounts of money that you cashed at any given time?

A    Between I think three, four thousand, or seven or eight thousand.  Nothing above ten thousand.

Q    Nothing above.  And what would you do with the money when you get it?

A    I would give it back to her.

Q     Uh-huh.

A     Then she records everything and she tells me, come
in the office.  Then sometimes she told me to--she will
give me the money and go see a vendor.  Go say, hello,
and give him this bag.

Hence, as can be seen from the above excerpts, petitioner's

testimony regarding the timing and extent of his awareness of the

check cashing activity and its proceeds is fraught with

inconsistencies and ambiguities.  For example, petitioner stated

that he first learned of the check cashing activity when visited

by Ms. Encarnacion, which would indicate a date at some time

after the initial interview on June 2, 1997.  He then testified

that he participated repeatedly in the check cashing activity in

1996 and that he saw cash totaling $180,000 in a safe deposit box

during 1996.  He also vacillated on the amounts, times, and

locations of his participation.  In addition, Mrs. Ishizaki

proceeded to testify that petitioner saw monthly sales reports

for Privilege House and that the couple discussed company and

family finances throughout their marriage.  Moreover, petitioner

was admittedly involved in negotiating many of the furniture

sales made by Privilege House and knew the prices at which items

were sold to customers.  Given that the return at issue was not

signed until August of 1996, we are unable to say on this record

that petitioner did not at that point have sufficient reason to

know of unreported income to at minimum invoke a duty to inquire

further.

Furthermore, based on these circumstances, we in any event would be hard pressed to conclude that it would be inequitable to hold petitioner liable for the deficiency, as is required under section 6015(b)(1)(D). All indications are that the Ishizakis shared equally in the lifestyle funded by the cash transactions. The facts at bar simply do not present the type of disadvantage and unfairness contemplated by the section 6015(b) criteria. We hold that petitioner is not entitled to relief under subsection (b).

## IV. Section 6015(c)

Although it would not appear that petitioner has ever specifically advanced an argument under section 6015(c), respondent on brief has addressed this issue. We thus say a few words on the topic in order to more fully address the points raised by the litigants. As a threshold consideration, a requesting spouse is entitled to seek relief under subsection (c) only if at the time of the request the spouses are divorced, legally separated, or have been living apart for the preceding 12 months. Here, because the record before us fails to establish that petitioner meets even these preliminary criteria, we can afford him no relief under section 6015(c).

Petitioner's request for relief in this case was made through the vehicle of his petition filed on June 22, 1999. As regards divorce, legal separation, or separate habitation in

relation to that date, the evidence suggests the following. First, the record indicates that the Ishizakis' divorce settlement was not final even as of the time of trial in March of 2001. Mrs. Ishizaki testified "we not finalize our divorce situation yet, such as asset and debts, we haven't finalized", and she cited an upcoming May court appearance. The record also contains a schedule of assets and debts filed as part of the divorce proceedings which is dated March 15, 1999, further showing that formalities were in fact ongoing at least several months into the 1999 year.

Second, there is a complete absence of any documentary evidence or testimony that would raise the inference of a legal separation, much less the date thereof.

Third, the record likewise fails to establish with any degree of certainty that petitioner and Mrs. Ishizaki were not members of the same household at any time throughout the 1-year period preceding June 22, 1999. Mrs. Ishizaki mentioned that she had moved frequently during the pending divorce, but offered no timeframes or dates. Petitioner stated that separation was filed for on February 14, 1997, and alluded to a temporary apartment in late 1996, but he, too, was silent with respect to the critical time period. We therefore simply are not in a position to guess whether petitioner and Mrs. Ishizaki might have

cohabited at any time during their lengthy divorce proceedings. Hence, we hold that petitioner has failed to show that he is eligible to seek relief under section 6015(c).

Lastly, we note that because no party has either mentioned or discussed section 6015(f), we do not consider the question of relief pursuant to subsection (f) to be properly before the Court, and we decline to address it further.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.